## TOMLINSON v. BANK OF LEXINGTON.

(Circuit Court of Appeals, Fourth Circuit. May 1, 1906.)

No. 622.

1. BANKRUPTCY—PREFERENCES—MUTUAL ACCOUNTS BETWEEN BANK AND DE-
POSITOR.

Where a manufacturing company for some two years before its bank-
ruptcy had an agreement with the bank in which it kept its account sub-
ject to check by which it was allowed to overdraw in payment of cur-
rent expenses subsequent deposits to be applied to payment of such over-
drafts, deposits so made in the usual course of business and applied in
payment of previous overdrafts, made in payment of its pay rolls, freight
on material received, and other necessary expenses, do not constitute
preferences which the bank must surrender before proving an indebted-
ness on notes against the bankrupt estate although the company was in-
solvent when the deposits were made the bank having the right of
set-off in respect to the overdraft and the deposits under Bankr. Act 1898,
c. 541, § 68a, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3450.]

2. SAME—AGREEMENT TO GIVE SECURITY.

Where a bank allowed a customer to overdraw on the express agreement
that the customer should assign good accounts for collection to pay the
overdraft the subsequent assignment of the accounts, although the cus-
tomer was insolvent, did not constitute the giving of a preference.

Appeal from the District Court of the United States for the Western
District of North Carolina, at Greensboro.

David H. Blair, for appellant.

Emery E. Raper, for appellee.

Before PRITCHARD, Circuit Judge, and PURNELL, and WAD-
DILL, District Judges.

PURNELL, District Judge. The Bank of Lexington filed proof
of debt due it from Thomasville Manufacturing Company, bankrupt,
with the referee in bankruptcy. Said debt amounted to $13,100, due
upon six indorsed notes. Proof was filed and claim allowed November
9, 1904. At a meeting of creditors and without objection, S. H. Tom-
linson, trustee of the bankrupt, filed his petition before the referee,
alleging that the Bank of Lexington had received certain preferences
from the bankrupt, and asked that the proof of debt of the bank be re-
considered and rejected, unless the alleged preferences were surren-
dered. The Bank of Lexington filed an answer to the petition, denying
the receipt of any preference. The allegations of preference material
to this appeal is that the Bank of Lexington received two preferences:
(1) By the payment of an overdraft due on the bank account of the
bankrupt of $2,241.31. (2) On account of the payment of a certain
check for $330.30 drawn by Thomasville Manufacturing Company
"to the order of cash for Sears, Roebuck & Co.," and paid by the bank.
The referee dismissed the petition and refused the prayer thereof,
and upon exceptions filed, the cause was certified to the District Judge,
who, after hearing argument, confirmed the report both as to findings
of fact and conclusions of law.

The Thomasville Manufacturing Company did its banking busi-
ness with the Bank of Lexington, and after the adjudication of bank-

ruptcy against the Thomasville Manufacturing Company it had a balance to its credit in bank of $67.99, which the trustee received.

The referee finds:

"The relation existing between the two concerns was a banking relation, the bankrupt having kept its account with the said bank, the same being a mutual running account, the bank receiving deposits from the company, paying its check when presented, and at times allowing the said account to become overdrawn and applying the next succeeding deposit in the discharge of the said overdrafts, not only in the regular and due course of banking business as usually conducted, but on a distinct understanding and agreement to that effect." In the course of such dealings, on the 31st day of August, 1904, there was an overdraft of $377.14, and the same was increased from time to time during the succeeding month of September, till on the 25th day of said month it amounted to the sum of $2,241.31, the same consisting of various sums advanced for the payment of payrolls of the company, freight on material shipped for manufacture, the concern being engaged in the manufacture of furniture. In addition to advancements for necessary expenses such as above, the checks of the company were also honored by the bank in the payment of pressing accounts due various creditors over the country for material used in the business, and at such times when the deposits of the company were quite small, and not near large enough to cover amounts called for in its checks. Still said overdraft was made under the agreement which had continued for almost two years between the two institutions, that the deposits when made could be applied to existing overdrafts. In other words, the referee finds that by the agreement with the bank as to overdrafts, it was largely able to conduct its business as a manufacturer without the necessity of making a direct loan at bank for any small amount which it might need in the general run of its business. Not only was there a distinct agreement as to the formation and method of payment of overdrafts, but Mr. Montcastle testifies that the particular overdraft, the payment of which is herein insisted on as a preference which the bank should surrender, was made under and because of the promise of the company to deposit the proceeds of certain good accounts held by the company to the payment of the overdraft.

Item 2, $330 arose out of the account above referred to as assigned. Bankrupt sold a bill of goods to Sears, Roebuck & Co., for $1,951.22, and at the time of sale agreed to wrap in burlaps before shipping, and on failure to so wrap to allow a rebate of 15 cents on each chiffonier shipped. The goods were shipped not wrapped in burlaps, and the bill made out against the purchaser for the whole amount without deducting for burlaps, and transferred to the Bank of Lexington, as above stated for the face value less usual discount. Afterwards, the Thomasville Manufacturing Company drew the check for the amount in question on the Bank of Lexington, payable to cash and sent it to Sears, Roebuck & Co., to pay the rebate. When the account was assigned it was represented to it by the Thomasville Manufacturing Company that the whole amount was due.

The appeal really presents but two questions, though in the record there are five exceptions, viz., was this a preference; and, second, as insisted on by appellant, was there any agreement by the bankrupt, at the time the overdraft was permitted, to assign specific accounts to the bank, and if so, what accounts. Were the accounts assigned the same accounts that were agreed to be assigned, and when, and what effect would such an agreement have? What constitutes a preference under circumstances very similar to those here involved, when the

dealings are between a banking institution and one of its customers, seems to have been so fully discussed and settled by the Supreme Court in N. Y. County Natl. Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380, that we content ourselves with an extended quotation from the opinion as decisive of the case at bar. Like the case at bar, that was a proceeding to compel a bank to refund what was claimed to be a preference, made by one of its customers. The Circuit Court of Appeal's decision in Re Stege, 116 Fed. 342, 54 C. C. A. 116, was reversed. Case there was $40,000 due on notes held by the bank and an overdraft. Within the prohibited time the bankrupt made deposits, which, or a part of which, after balancing the overdraft the bank credited on one of the notes. The trustee insisting the bank should refund before being permitted to prove its debt. In the opinion, the court, speaking through Justice Day, who delivered the opinion, says at page 146 of 192 U. S., p. 201 of 24 Sup. Ct. (48 L. Ed. 380):

"We are to interpret statutes, not to make them. Unless other sections of the law are controlling, or in order to give a harmonious construction to the whole act, a different interpretation is required, it would seem clear that the parties stood in the relation defined in section 68a, with the right to set off mutual debts. the creditor being allowed to prove but the balance of the debt. Section 68a of the bankruptcy act of 1898. c. 541. 30 Stat. 565 [U. S. Comp. St. 1901, p. 3450], is almost a literal reproduction of section 20 of the act of 1867 (chapter 176, 14 Stat. 526). So far as we have been able to discover the holdings were uniform under that act that set-off should be allowed as between a bank and a depositor becoming bankrupt. In re Petrie, 7 N. B. R. 332, Fed. Cas. No. 11,040; Blair v. Allen, 3 Dill. 101, Fed. Cas. No. 1483; Scammon v. Kimball, 92 U. S. 362, 23 L. Ed. 483. In Traders' Bank v. Campbell. 14 Wall. 87, 20 L. Ed. 832, the right of a set-off was not relied upon, but a deposit was seized on a judgment which was a preference.

"But it is urged that under section 60a (30 Stat. 562 [U. S. Comp. St. 1901, p. 3446]) this transaction amounts to giving a preference to the bank, by enabling it to receive a greater percentage of its debts than other creditors of the same class. A transfer is defined in section 1 of the act to include the sale and every other and different method of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift, or security. While these sections are not to be narrowly construed so as to defeat their purpose, no more can they be enlarged by judicial construction to include transactions not within the scope and purpose of the act. This section 1 read with sections 60a and 57g (30 Stat. 562, 560 [U. S. Comp. St. 1901, pp. 3443, 3445]), requires the surrender of preferences having the effect of transfers of property 'as payment, pledge, mortgage, gift, or security which operate to diminish the estate of the bankrupt and prefer one creditor over another.' The law requires the surrender of such preferences given to the creditor within the time limited in the act before he can prove his claim. These transfers of property, amounting to preferences, contemplate the parting with the bankrupt's property for the benefit of the creditor and the consequent diminution of the bankrupt's estate. It is such transactions, operating to defeat the purposes of the act, which under its terms are preferences. As we have seen, a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage. gift or security. It is true that it creates a debt, which, if the creditor may set it off under section 68 amounts to permitting a creditor of that class to ob-

tain more from the bankrupt's estate than creditors who are not in the same situation, and do not hold any debts of the bankrupt subject to set-off. But this does not, in our opinion, operate to enlarge the scope of the statute defining preferences so as to prevent set-off in cases coming within the terms of section 68a. If this argument were to prevail, it would in cases of insolvency defeat the right of set-off recognized and enforced in the law, as every creditor of the bankrupt holding a claim against the estate subject to reduction to the full amount of a debt due the bankrupt receives a preference in the fact that to the extent of the set-off he is paid in full.

"It is insisted that this court in the case of Pirie v. Chicago Title & Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, held a payment of money to be a transfer of property within the terms of the bankrupt act, and when made by an insolvent within four months of the filing of the petition in bankruptcy, to amount to a preference, and that case is claimed to be decisive of this. In the Pirie Case, the turning question was whether the payment of the money was a transfer within the meaning of the law, and it was held that it was. There the payment of the money within the time named in the bankrupt law was a parting with so much of the bankrupt's estate, for which he received no obligation of the debtor but a credit for the amount on his debt. This was held to be a transfer of property within the meaning of the law. It is not necessary to depart from the ruling made in that case, that such payment was within the operation of the law, while a deposit of money upon an open account subject to check, not amounting to a payment but creating an obligation upon the part of the bank to repay upon the order of the depositor, would not be. Of the case of Pirie v. Chicago Title & Trust Co., it was said in Jaquith v. Alden, 189 U. S. 78, 82, 23 Sup. Ct. 649, 650 (47 L. Ed. 717): 'The judgment below was affirmed by this court, and it was held that a payment of money was a transfer of property, and when made on an antecedent debt by an insolvent was a preference within section 60a, although the creditor was ignorant of the insolvency and had no reasonable cause to believe that a preference was intended. The estate of the insolvent, as it existed at the date of the insolvency, was diminished by the payment, and the creditor who received it was enabled to obtain a greater percentage of his debt than any other of the creditors of the same class.' In other words, the Pirie Case, under the facts stated, shows a transfer of property to be applied upon the debt, made at the time of insolvency of the debtor, creating a preference under the terms of the bankrupt law. That case turned upon entirely different facts, and is not decisive of the one now before us. It is true, as we have seen, that in a sense the bank is permitted to obtain a greater percentage of its claim against the bankrupt than other creditors of the same class, but this indirect result is not brought about by the transfer of property within the meaning of the law. There is nothing in the findings to show fraud or collusion between the bankrupt and the bank with a view to create a preferential transfer of the bankrupt's property to the bank, and in the absence of such showing we cannot regard the deposit as having other effect than to create a debt to the bankrupt and not a diminution of his estate."

The bankrupt in the case at bar was struggling for existence—it was in financial straits, had made propositions of composition or settlement with its creditors and the bank in a legitimate way was extending a helping hand, agreed on a basis for extending credit, allowing overdrafts. There was a large amount, $13,100, due on notes endorsed by officers of the bank, which, if the manufacturing company could succeed, the bank could realize from the assets of the bankrupt; if not, the debt would be lost or at least much reduced. If such assistance on the part of banking institutions are to be condemned, held to be preferences in case of bankruptcy, many of the manufacturing and other institutions would suffer, especially in their early days of struggle, before they had attained a standing on a

foundation strong enough to enable them to resist the financial storm arising from an inability to sell their product or realize on accounts, bills of lading or other current assets. In short it would close to them all the avenues of commerce and compel them to do a C. O. D. business on a very small scale, virtually putting them out of business as soon as it is proved they cannot meet their liabilities, are insolvent as defined in the bankrupt act. Congress did not intend nor did it in fact ever enact a law to effect this purpose. Though it is said by the referee and confirmed by the District Court that every element of a preference was proved, we are constrained to the opinion that both of these learned judicial officers had the mental reservation that the important element of an intention to give or to receive a preference was absent and not an inference to this effect could be drawn from the facts. Both held there was no preference and so adjudge. The check sent Sears, Roebuck & Co., was in no wise a preference, was not even given to the bank and was payable to cash and sent to Sears, Roebuck & Co., to correct an error. There is no pretense that this firm had any information tending to show they knew or had reason to suspect the manufacturing company was insolvent or intended to give them a preference or that they asked or intended to receive one. This payment was to the Chicago firm, not the bank. True it was a credit on the account assigned to the bank, but, in all lights, it was an act of equity. The transfer, too, was made as found by the referee, not only in the regular and due course of business, but on a distinct understanding and agreement to that effect. It should be borne in mind none of these overdrafts or the proceeds of assigned accounts were credited on the bank debt of $13,100, evidenced by notes endorsed by Montcastle and Ward, officers of the bank, but were credited on the overdrafts permitted under the express agreement; "a fair exchange of values," as expressed in Cook v. Tullis, 18 Wall. 332, 21 L. Ed. 933, "which may be made at any time even if one of the parties is insolvent." The objection that no specific accounts were mentioned in the agreement is without force. Those accounts may not have been in the shape of bills collectible at that time, not due or negotiable, in fieri. A contract made for the goods when manufactured but the finished product not in esse, hence the account could not have been specified, pointed out, or named. It is not necessary to hold the agreement was a valid lien, under any lien law, but it was an equitable pledge of "good accounts" on the faith of which the bank parted with funds—possibly not its own but on deposit, which it might rightfully use in banking and discounting commercial paper, as is customary with such institutions. It was a risk it assumed, but no greater risk, as it appeared to the officers, who endorsed for the manufacturing company almost to the last moment, than is taken by such institutions almost every day. Until the October inventory they believed the company solvent (they were officers also of the company), and previous inventories had shown it was solvent. Nor should the fact be overlooked, as found by the referee, that the overdraft, consisting of various sums advanced, were for the necessary expenses of the company, the payment of pay rolls, freight, on

material shipped for manufacture, pressing accounts, some of which would support a lien and many would be prior or preferred claims under the bankrupt act. And said overdraft was under an agreement which had continued for "almost two years," and the overdraft was permitted under the agreement before referred to.

Our conclusion, therefore, is that the bank has not received a preference such as should be refunded before being permitted to prove its debt, and the decree of the referee as confirmed by the District Court should be affirmed.

Affirmed.