## McDONALD v. CLEARWATER SHORTLINE RY. CO.

(Circuit Court, D. Idaho, N. D.    July 18, 1908.)

1. BANKRUPTCY (§ 165*)—VOIDABLE PREFERENCE—TRANSFER AS SECURITY FOR LOAN.

Property transferred by a borrower at the time of receiving a loan and for the purpose of making the lender safe is security, and the validity of the transfer, if not accompanied by positive fraud, is recognized and enforced in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 259; Dec. Dig. § 165.*]

2. BANKRUPTCY (§ 160*)—VOIDABLE PREFERENCE—PROOF OF INSOLVENCY.

The fact that a corporation engaged in the performance of a contract which required a considerable expenditure before it was entitled to payment thereunder arranged with a bank for making overdrafts is no evidence that it was insolvent at the time within the meaning of Bankr. Act July 1, 1898, c. 541, § 1, subd. 15, 30 Stat. 545 (U. S. Comp. St. 1901, p. 3419).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 160.*]

3. EVIDENCE (§ 43*) — JUDICIAL NOTICE—PROCEEDING IN OTHER COURTS—RECORD IN BANKRUPTCY PROCEEDING.

In a plenary action in a Circuit Court by a trustee in bankruptcy, the court cannot take judicial notice of matters of record in the District Court in the bankruptcy proceedings.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 65; Dec. Dig. § 43.*]

4. BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCE—SUFFICIENCY OF EVIDENCE.

Evidence considered, and held insufficient to establish the insolvency of a corporation at the time it made an assignment of a debt due it to a bank as security for past and future overdrafts, or that the bank had reasonable cause to believe that a preference was intended, so as to render the transfer a voidable preference on the bankruptcy of the corporation.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 255–257; Dec. Dig. § 166.*]

5. SALES (§ 201*)—EFFECT—TRANSFER OF TITLE—DELIVERY AND ACCEPTANCE.

A lumber company which was under contract to furnish ties to a railroad company hauled a number of ties and piled them on the railroad company's right of way, where they were inspected, accepted, and marked by its agent in the presence of the secretary of the lumber company, and a certificate or invoice was issued therefor. Held, that there was such delivery as to pass title, which was not affected by a subsequent at-

---

tachment of the ties by a creditor of the lumber company nor by any action of the court in subsequent bankruptcy proceedings against such company.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 529–541; Dec. Dig. § 201.*]

6. SALES (§ 202*)—PASSING OF TITLE—NECESSITY OF PAYMENT.

A lumber company was under contract to furnish ties, and hauled a number and piled them on the purchaser's right of way, where they were inspected and accepted and invoice issued therefor. *Held*, that there was such a delivery as passed title, though payment had not been made therefor at the time of a subsequent attachment in bankruptcy proceedings, there being no requirement in the contract that title should not pass until payment.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 542, 545; Dec. Dig. § 202.*]

7. SALES (§ 442*)—ACTION FOR PRICE—COUNTERCLAIM.

By a contract by which a lumber company agreed to furnish a stated number of ties to a railroad, it was provided that the seller should convey a good and unincumbered title, and in case of legal proceedings against the purchaser for any of said ties or their value or to establish any lien thereon it should indemnify and hold harmless the purchaser from all loss, damages, and legal expenses thereby incurred. After certain ties had been delivered to and accepted by the railroad company, an action of trespass was brought against it and the lumber company by the United States to recover the value of certain of the ties which had been unlawfully cut and removed from government land. *Held*, that the amount recovered and the expense and costs of such action paid by the railroad company were recoverable by it by way of counterclaim from the lumber company, but that costs and expenses incident to a wrongful attachment of the ties by a creditor of the lumber company after title had passed to the railroad company were not so recoverable.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1296; Dec. Dig. § 442.*]

At Law. Trial to the court without a jury.

I. N. Smith, for plaintiff.

James E. Babb, for defendant.

DIETRICH, District Judge. On August 1, 1899, the Clearwater Land, Log & Lumber Company, hereinafter referred to as the lumber company, entered into a written contract with the defendant, hereinafter referred to as the railroad company, by which the former was to furnish to the latter, between the date of the contract and July 20, 1900, 300,000 cross-ties, at prices therein specified. Prior to January 1, 1900, deliveries were made aggregating 20,026 ties, upon account of which some payments were made, leaving due to the lumber company a balance of $378. On or about January 20, 1900, another delivery was made of 11,305 ties, invoicing $3,302.52, at the contract price.

For some time after the contract was executed, the lumber company transacted its banking business with the Kendrick State Bank, but, for reasons which it is not necessary to determine, early in January, 1900, it proposed to J. B. Johnston, who was doing business in the name of the Orofino Banking Company, that it open an account with him, and, accordingly, on January 9, 1900, an understanding was

reached by which the lumber company was to do all its banking business with the Orofino Banking Company, and was to deposit therein its vouchers and drafts, and in turn was to be permitted to check against its account. In speaking of the understanding of that date, the witness J. B. Johnston, whose testimony is not contradicted, said:

"Well, they had desired to open an account with me—that is, with the Orofino Banking Company—and promised me that voucher as soon as the ties were inspected and delivered. They also said that they would do all their banking business with the Orofino Banking Company from that time on. They promised me this $3,302.50 voucher from the railroad company."

The bank immediately began to honor the lumber company's checks, and at the close of business on the 18th day of January the overdrafts aggregated $851.50. No other checks were paid until January 25th, upon which day the amount of the overdraft was practically doubled, and still no credits. For reasons which do not clearly appear, the lumber company, on January 21st, telegraphed to one John Willis, timber agent for the railroad company, at Brainerd, Minn., advising him that upon that day the railroad company's agent at Potlatch, where the ties were delivered, had received ties of the value of $3,-302.52, and requested him to issue a check for the amount to the Orofino Banking Company, explaining that the money was needed, and that the lumber company could get the money from the bank if the railroad company would agree to issue the voucher to the bank. On January 24th, Willis telegraphed to the bank from Duluth, advising the latter that the railroad company would accept the order of the lumber company for $3,302.52, if properly drawn to cover the January invoice of ties, and upon the same day a formal order, directed to the treasurer of the railroad company, was executed by the lumber company and delivered to the bank. The receipt of this by Willis was acknowledged on January 28th, with the information that he had requested the treasurer to hurry the voucher forward. Other advances were thereupon made by the bank to the lumber company, almost all of which were prior to February 5th, and also some deposits to the credit of the lumber company, the excess of the debits over the credits being $43.27 less than the $3,302.52.

Whether any voucher for the $3,302.52 was ever delivered to the bank is not made to appear, but, for some reason not disclosed, the railroad company did not, in accordance with the understanding of the parties, make payment to the bank; perhaps its failure in that respect is accounted for by current and subsequent events hereinafter referred to, which may also explain why credit for the amount of the promised voucher was not given upon the books of the bank.

Scarcely had the correspondence to which reference has been made taken place before the troubles of the lumber company began. The United States, claiming that they had been wrongfully cut upon public lands, seized the delivered ties, but a few days later released them, and took possession of other ties which had been cut but were still in the woods. Almost immediately thereafter, one of the creditors of the lumber company caused the 11,305 ties, for which the voucher was to be issued, to be attached by the sheriff of Shoshone county. Thereafter, on April 3, 1900, a petition in bankruptcy was filed by sev-

164 F.—64

eral of the creditors of the lumber company, and accordingly an order adjudicating it a bankrupt was entered on June 8, 1900, and, in due time, a trustee was appointed. On or about June 29, 1900, the Orofino Banking Company assigned to the Exchange National Bank of Spokane its interest in the claim against the railroad company for the $3,302.52, and upon September 5, 1902, the railroad company paid to that bank the full amount, less the sum of $244.96, which had theretofore been paid by it to the United States in settlement of suits which had been brought against it and the lumber company for damages for alleged trespass in cutting and removing the ties from public lands.

Charles L. McDonald, the plaintiff herein, as trustee in bankruptcy for the lumber company, commenced this action against the defendant in the state district court on October 2, 1903. In his complaint he ignores the existence of the order or assignment of the lumber company to the banking company, and states a cause of action at law for the recovery, upon the contract referred to, of $3,680.52, the same being the aggregate amount of the $378 and the $3,302.52. By proper proceedings the cause was removed to this court, and thereafter the defendant answered, pleading the assignment to the Orofino Banking Company and the payment by the defendant to the Exchange National Bank, and also setting forth certain items of counterclaim. A jury was waived, and the cause has been submitted for decision upon a stipulation of facts, together with the deposition of the banker, J. B. Johnston.

In plaintiff's reply brief he, for the first time, objects to the validity of the assignment by the lumber company to the bank, that the order or written assignment does not bear an internal revenue stamp. There must be some misapprehension in this respect, for in paragraph 7 of the stipulation of facts there is set forth a copy of the order or assignment, dated January 24, 1900, bearing this notation: "Int. Rev. Stamp 2 cts. affixed & cancelled 1/24/1900 C. L. L. & L. Co."

The principal and most serious contention urged by the plaintiff is that, assuming the assignment to have been valid between the parties, it constituted a preference under the bankruptcy law, and may therefore be avoided by the trustee in bankruptcy. By counsel for the defendant it is elaborately argued that, even if the assignment be deemed to be a preference, the plaintiff cannot proceed, in an action at law, upon the theory that it was absolutely void, but his remedy was by a suit in equity to set aside the assignment and recover the property, or the value of the property, thus transferred by the bankrupt. In consideration of the conclusion I have reached upon the merits, it is not necessary to determine whether such relief is grantable exclusively by a court of equity. Assuming, but not deciding, that the trustee has not mistaken his remedy, and further adopting the view, most favorable to plaintiff, that the rights of defendant are no greater than the bank would have, had the amount of the claim been paid to it, and had this action been brought against it to recover the amount so paid, should the plaintiff succeed? The transactions took place in 1900, and hence to the provisions of the general bankruptcy Act of 1898, prior

to amendment of 1903, we must look for the law.  By subdivision 15 of section 1 of this act (Act July 1, 1898, c. 541, 30 Stat. 545 [U. S. Comp. St. 1901, p. 3419]) it is provided that:

"A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

By subdivision "a" of section 60 it is provided that:

"A person shall be deemed to have given a preference if, being insolvent, he has procured, or suffered a judgment to be entered against him in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

It is upon this latter provision that the plaintiff lays especial emphasis, and upon it mainly he relies for his right to recover.  Undoubtedly the assignment under consideration was a "transfer" of "property." In order that the case may be brought within the scope of this subdivision, however, it was incumbent upon the plaintiff to show that the assignment was made when the lumber company was "insolvent," and, further, that the effect of such transfer was to enable the bank to obtain a greater percentage of its debt than any other creditor of the same class.  That these conditions must appear is conceded by the plaintiff; and it is further conceded that a preference is not voidable unless it is given in satisfaction of an antecedent debt—that is, a debt which existed at the time the transfer was made.  Property transferred by a borrower at the time of receiving a loan, and for the purpose of making the lender safe, is security; its validity, if unaccompanied by positive fraud, is recognized and enforced in bankruptcy.  Transfers which do not diminish the estate of the bankrupt, but which constitute only a fair exchange of property, are not preferences.  Cook v. Tullis, 85 U. S. 332, 21 L. Ed. 933.

Upon the other hand, the plaintiff earnestly insists that, under the Act of 1898, prior to amendment, a transfer of property, or a payment of money by the debtor to a creditor on account of an antecedent debt, was a preference, although the creditor was ignorant of the insolvency of the debtor and had no reasonable cause to believe that a preference was intended; and in support of this view the decision of the Supreme Court of the United States, in Pirie v. Chicago Title & Trust Company, 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, is cited.  In that case Frank Bros., the bankrupts, had, within four months, and while they were insolvent, paid to Carson, Pirie, Scott & Co. money on account.  The creditor was not aware of the insolvency of the bankrupts, and had no reason to believe that a preference was intended.  At the time the bankruptcy proceedings were instituted there was still due the creditor a balance, and it presented its claim therefor against the bankrupt estate, and the issue was whether, under such circumstances, the creditor must surrender the preference before its claim could be allowed.  Subdivision "g" of section 57 of the bankruptcy act provides that:

"The claims of creditors who have received preferences shall not be allowed unless such creditors have surrendered their preferences."

Assuming that in the Pirie Case the creditor had received a preference, it is obvious that its claim against the estate for the balance due to it could not be allowed without prior surrender of such preference. But here neither the bank nor any one in privity with it, is presenting a claim against the estate, and hence the provisions of the statute just quoted are not applicable. Subdivision "b" of section 60 is as follows:

"If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of a petition and before the adjudication, and the person receiving it or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property, or its value, from such person."

Here is found plaintiff's authority for bringing a suit to avoid a preference, and here, too, are prescribed the conditions upon which he may recover; and, as was said by the Supreme Court in the Pirie Case, supra:

"If the conditions mentioned exist, the preference may be avoided; but if the person receiving the preference did not have cause to believe it was intended, what then? It follows that, the condition being absent, its effect will be absent. In other words, he may keep the property transferred to him, whether it be a complete or partial discharge of his debt. * * * Unless surrendered, he who received it cannot prove his debt or other debts. His election is between keeping the preference and surrendering it. That is the favor of the law to his innocence, but, aiming to secure equality between him and other creditors, can the law indulge farther? He may have been paid something— maybe a greater percentage than other creditors can be. That is his advantage and he may keep it."

Upon his own theory, therefore, before plaintiff can succeed in avoiding the alleged preference, the existence of four conditions must be made to appear: First, that the lumber company was insolvent when the assignment was made; second, that the assignment was made upon account of an antecedent indebtedness; third, that the bank had reasonable cause to believe that, by the assignment, it was intended to give a preference; and, fourth, that the effect of the assignment was to enable the bank to obtain a greater percentage of its debt than other creditors of the same class.

If, following the assumption that the plaintiff may recover in an action at law, it should be held that the plaintiff need not plead the existence of these conditions, but may make proof thereof in response to the defendant's allegations and proof of the assignment, it cannot be doubted that upon him rested the burden of proof. There is much to be said for the view advanced by the defendant, that while the assignment was not formally made until the 24th day of January, 1900, it should be deemed to relate back to the 9th day of January, at which time the lumber company agreed to turn the voucher over to the bank. In other words, upon the 9th day of January there was an agreement to give security, and, relying upon this agreement, the bank made advances which it would not otherwise have made. Such a question was decided by the Circuit Court of Appeals of the Fourth

Circuit, in Tomlinson v. Bank of Lexington, 145 Fed. 824, 76 C. C. A. 400, and it was there held that, where a bank allowed a customer to overdraw on the express agreement that good accounts should be assigned to the bank for collection to pay the overdraft, the subsequent actual assignment of these accounts did not constitute the giving of a preference, although at the time of the assignment the customer was insolvent. The court says:

"If such assistance on the part of banking institutions is to be condemned, held to be preferences in case of bankruptcy, many of the manufacturing and other institutions would suffer, especially in their early days of struggle, before they had obtained a standing on a foundation strong enough to enable them to resist the financial storm arising from an inability to sell their product or realize on accounts, bills of lading, or other current assets. In short, it would close to them all the avenues of commerce, and compel them to do a C. O. D. business on a very small scale, virtually putting them out of business as soon as it is proved they cannot meet their liabilities, are insolvent, as defined in the bankrupt act. Congress did not intend, nor did it in fact ever enact, a law to effect this purpose."

Again, the court says:

"The objection that no specific accounts were mentioned in the agreement is without force. Those accounts may not have been in the shape of bills collectible at that time, nor due or negotiable in fieri."

And again:

"It is not necessary to hold that the agreement was a valid lien under any lien law, but it is an equitable pledge of 'good accounts' on the faith of which the bank parted with funds—possibly not its own, but on deposit—which it might rightfully use in banking and discounting commercial paper, as is customary with such institutions."

See, also, Jaquith v. Alden, 189 U. S. 78, 23 Sup. Ct. 649, 47 L. Ed. 717; Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380; West v. Bank, 16 Okl. 328, 85 Pac. 469.

It must be admitted that the rule in the Tomlinson Case, if adopted here, would be controlling, for, upon the 9th day of January, when the agreement for the assignment was made, there was nothing due from the lumber company to the bank, and in no view of the law or the disputed facts could an assignment upon that day, in the absence of positive fraud, be deemed a preference.

But, considering the assignment as not having been made prior to the date upon which the written order was formally executed and delivered to the bank—that is, upon January 24th—what are the rights of the parties? Upon January 24th the lumber company owed the bank $851.50. There was, therefore, an antecedent indebtedness, to pay which, or to secure which, the assignment was made, and to that extent, at least, the existence of one of the necessary conditions, appears. Are the other three conditions proven?

There is no direct proof of the financial condition of the lumber company upon January 24th, or, indeed, at any other time. It does appear that about that time it was unable to pay its debts in the ordinary course of business, and this would have been sufficient under the law of 1867 to establish insolvency; but under the act of 1898, as we have seen, it must be shown that the aggregate of the property

of the lumber company, at a fair valuation, was insufficient to pay its debts. My attention has not been called to any feature of the record, either in the stipulation of facts, or the exhibits, or the testimony, or the pleadings, which enables me to find or infer what property the lumber company owned, or what was its reasonable value, on the 24th day of January, 1900, or upon any other date; upon this point the record is absolutely silent. Evidence of the indebtedness of the company is not altogether satisfactory, but possibly sufficient to enable the court to make some intelligent estimate thereof. In the argument counsel for the plaintiff repeatedly refers to the fact that the lumber company was arranging for overdrafts, and was urging the railroad company to hasten payment of invoices, and it is insisted that therefore the lumber company must have been insolvent, and that the bank was aware of such insolvency. But the conclusion does not follow; the aggregate of the property of a debtor, taken at a fair valuation, may be far in excess of the amount of his debts, and still he may not have the current funds with which to meet his indebtedness as it falls due. Here the lumber company may have been doing business upon a large scale with a limited capital, and necessarily some time must elapse before it could realize upon the finished product of the. work in which it was engaged. It must incur indebtedness for supplies and for labor, which ultimately could be paid for out of the proceeds of the contract, but which in the meantime must be taken care of with other funds. That it should be arranging for overdrafts, and promising to turn into the bank vouchers and drafts and checks, was not extraordinary, and in itself its conduct in that respect is insufficient to create even a suspicion of insolvency, as the term is used in the bankruptcy law. Suppose the owner of a thousand head of cattle came to a bank, with the statement that the cattle were ready for market, and he desired to ship them, but that he had no current funds, and he applied to the bank for advances with which to meet the expense of gathering the cattle and loading them and paying the freight charges and other expenses of taking them to the market, with the agreement that in consideration of such advances the bill of lading should be assigned to the bank, would such facts be sufficient from which the court could legitimately draw an inference that the owner of the cattle was insolvent or that the bank had reasonable cause to believe him insolvent? Nor would the case be essentially different if the stockman was already indebted to the bank in a reasonable amount upon overdrafts allowed for paying the expenses of wintering the cattle.

In principle the illustration cannot be distinguished from the facts in this case, and similar transactions are of daily occurrence. The language above quoted from the Tomlinson Case clearly portrays the results of a ruling such as is here contended for by the plaintiff. To hold that the bank knew or had reason to. believe that the lumber company was insolvent on the 9th day of January, or that it was financially embarrassed, is little less than preposterous. The bank proceeded to make advances, and permitted overdrafts to the amount of approximately $850, without any security other than the bare oral

promise of the officers of the lumber company to the effect that its receipts, including the voucher for the ties, would in the future be turned over to the bank. This promise might or might not be fulfilled, and it is not credible that a banker would, if he thought the lumber company insolvent or embarrassed, or likely to be embarrassed, have advanced any amount at all. The lumber company had not theretofore been a customer of the bank, and hence no consideration of past or existing relations could have weighed with the bank to induce it to extend credit to a needy customer, with the hope that, temporarily relieved, he would be able to recover himself. So far as is disclosed by the record, nothing took place between the 9th of January and the 24th of January, either affecting the actual responsibility of the lumber company or tending to cast suspicion upon its solvency. That its unpaid bills were increasing was not strange, for it was engaged in a large enterprise, in the prosecution of which it was daily employing labor and incurring other expenses, but from which, during this period, it was receiving no money returns. It was doubtless known to the bank that the lumber company was making a comparatively large delivery of ties, and that until it could be paid for such delivery it had no means for meeting its accruing daily expenses. Assuming—and there is nothing to the contrary—that the contract with the railroad company was a profitable one, the bank had the right to proceed upon the theory that payment on account of the deliveries from time to time would enable the lumber company to meet all of its accruing obligations, and, if it confided in the honesty of the officers of the lumber company, there was nothing suspicious or unusual in its willingness to permit the account to be overdrawn. Nor is it strange that, when the January delivery of ties had been accepted by the railroad company, the bank, before increasing its advances, desired assurance both from the railroad company and the lumber company of the amount which was due on account of such delivery, and that it would be paid directly to the bank as soon as it was practicable for the railroad company to do so in the ordinary course of business.

While in the absence of a showing as to the real financial condition of the lumber company much is left to conjecture, I am persuaded that its downfall was precipitated by the seizure of the ties by the government; for apparently these were its only visible assets, upon which it could rely for current funds. Unless it had a substantial capital or a very large credit, the natural and the inevitable result of such a claim upon the part of the government would be to deprive it of all future credit, and to arouse its existing creditors to demand immediate payment. It appears that while the government soon released the ties for which the $3,302.52 was due, it seized other ties which the lumber company had cut and which were still in the woods. What number of ties was so seized is not disclosed, but all the expense which had been incurred in getting them out was thus lost; and, in addition thereto, there were the claims of the government for trespass, amounting to nearly $5,000, for which suit was brought. Thus, in a few days, and from causes not theretofore known or appreciated by any of the parties, the financial status of the lumber company underwent a radical

change, and its credit received a fatal shock. The consternation of creditors upon learning of the claims of the government may well be imagined, and it is not improbable that the action of the bank in canceling the note which it took from the lumber company on the 3d of February, and charging the proceeds thereof back to the lumber company upon the day after the note was executed, is thus accounted for. That it had reason for alarm must be admitted, for, if the government insisted upon its claim that the January delivery of ties had been wrongfully cut upon public lands, the railroad company might not pay anything on account thereof, and the bank would thus be left without security or resources from which the lumber company's overdraft could be taken care of. Nor, under the circumstances, is it strange that the bank did not credit up to the account of the lumber company the $3,302.52. It had not received the money from the railroad company, and, in view of the attitude of the government, there was doubt whether it ever would receive payment. But in any view the failure to give credit in the books of the company is not a controlling consideration. The bank was the assignee of the claim, and whether the assignment was with the understanding that the lumber company should receive credit for the full amount thereof at once, without waiting for the collection, or whether the understanding was that the collection, when made, should be credited to the account of the lumber company, the assignment was made for the protection of the bank against the overdraft account, and the bank thus acquired an irrevocable interest in the claim.

Not only is there no proof of the aggregate of the lumber company's property at a fair valuation upon the date of the assignment, but the record is also silent as to the value of the bankrupt's assets at any time after the bankruptcy proceedings were instituted. That being the case, upon what basis can the court make a finding that the effect of the assignment was to enable the bank to obtain a greater percentage of its debt than other creditors of the same class? It is conceded by counsel that there is no positive or direct evidence as to the value of the bankrupt estate, but it is suggested that the record in the bankruptcy proceeding is in this court, and of that this court must take judicial knowledge. Assuming, but not deciding, that the record in the bankruptcy proceeding would be competent evidence against the defendant in this case, that record is not before this court. This action is not ancillary to the bankruptcy proceeding, but is entirely independent thereof, and there is no rule requiring or authorizing the court to take knowledge of the existence or contents of all papers filed in the office of its clerk. Moreover, the bankruptcy proceedings were not had in this court, but in the District Court.

Without prolonging the discussion, I think it must be held that plaintiff's proof wholly fails to show that the lumber company was insolvent when the assignment was made, or that the bank had reasonable cause to believe that by the assignment it was intended to give a preference, or that the effect of the assignment was to enable the bank to obtain a greater percentage of its debt than other creditors of the same class. There remains to be considered a contention of the defendant some-

what independent of its position that the assignment was a voidable preference, and that is, that the 11,305 ties were not delivered to the railroad company in January, 1900, but were thereafter delivered by the trustee in bankruptcy. Touching this point, the facts are stipulated to be as follows: That on or about the 19th day of January, 1900, the lumber company delivered, along the spur track of the railroad company at North Fork, in Shoshone county, the 11,305 ties; that thereupon an inspector representing the railroad company, in the presence of the secretary of the lumber company, who pointed out the ties to the inspector, examined the ties and approved them, and marked them with the railroad company's paint, and after so inspecting and marking the ties the inspector issued to the railroad company's various officials and to the lumber company an invoice of the ties "and received said ties." And thereupon the inspector went with the secretary of the lumber company to the offices of the resident engineer of the railroad company at Potlatch, in Nez Perce county, where the engineer was informed that the ties had been delivered and accepted. After the railroad company had hauled a portion of the ties from the place where they were piled along its spur track, the balance were attached by a creditor of the lumber company and were taken into the possession of the sheriff of Shoshone county by virtue of a writ of attachment, but the same were not removed from the place where they were piled. On October 1, 1900, the trustee in bankruptcy of the lumber company filed a petition before the referee in bankruptcy setting forth the facts relative to the delivery of the ties to the railroad company and the seizure thereof by the government, and its subsequent release thereof, and the subsequent attachment by the sheriff of Shoshone county, and the bankruptcy of the lumber company, and prayed for an order permitting him, the trustee, to allow the railroad company "to receive and take away the said ties." Thereupon, after notice to all parties in interest, the referee made an order that the trustee "permit the said Clearwater Short Line Railway Company to receive and take away said ties, and that said B. F. Morris (the then trustee) should no longer be bound as such trustee to retain said ties or to account for the same." The order further provided that nothing therein contained "should in any way interfere with or affect any right, if any, which the creditors of said Clearwater Land, Log & Lumber Company, or the trustee in bankruptcy thereof, might have to recover of said Clearwater Short Line Railway Company the purchase price of said ties under said contract between the said railway company and said Clearwater Land, Log & Lumber Company." Defendant insists that the delivery to it was consummated in January, and in this contention I think it is clearly right; it is difficult to conceive of a more complete delivery. The ties had been hauled by the lumber company from the place where they were cut, and, for the purpose of turning them over to the railroad company, had been piled upon its right of way. They were inspected, counted, and accepted by the railroad company, and its brand was placed thereon. Thereupon the inspector certified to the lumber company and to the officers of the railroad company the receipt of the ties. What else remained to be done or could have been done to com-

plete the delivery? The mere fact that payment in cash for the ties was not made upon the spot is immaterial. There was no provision in the contract that title should not pass or that delivery should not be considered to have been made until the purchase price was paid.

The delivery to the railroad company having been made before the bankruptcy proceedings were instituted, the trustee in bankruptcy could not rightfully control or take possession thereof, nor is there any showing that he ever did take actual possession. Being in doubt as to his duty and responsibility in the premises, it was proper, before giving his consent that the railroad company should remove the ties, that he be authorized by the court to give such permission. And the fact that the railroad company did not take the ties until such order was made is without significance. In view of the attachment and the bankruptcy proceedings, some question may have been raised as to the rights of the parties, but, under the facts as here stipulated, there is no room for doubt. There was no authority in law for either the sheriff of Shoshone county or the trustee in bankruptcy to interfere with the railroad company's possession of the ties; with their delivery, title passed. There is nothing either in the petition to the referee or the order made by him material to the issues here. It was clearly the intention of the referee, and it is expressly provided, that the rights of the parties, whatever they may have been, were not to be affected by the order. The position of the trustee in this action is neither strengthened nor weakened by those proceedings.

My conclusion upon this phase of the case is that plaintiff is not entitled to recover any part of the $3,302.52. True, the amount exceeds the aggregate of the overdraft account by $43.27, and there are some items of charge against the lumber company upon the books of the bank the validity of which may well be doubted. But the equities between the bank and the lumber company cannot be adjusted in this action. Moreover, it is not clear that the conclusion which I have reached upon the whole case does not coincidentally approximate the result of an equitable accounting between the defendant, the bank and the lumber company.

It is admitted that the plaintiff is entitled to recover the $378 item, subject, however, to a reduction in the amount of the defendant's valid counterclaims. By its contract, the lumber company guaranteed that it would convey a good and unincumbered title to the ties which it was to deliver to the railroad company; and it was further agreed that "in case of legal proceedings against the company for any of said ties or their values, or to establish any lien or claim thereon, or thereto, said second party (the lumber company) will indemnify and hold harmless the company (railroad company) from all loss, damages, costs, and expenses thereby incurred." It is stipulated that some of the ties delivered were wrongfully cut upon the public land of the United States, and that the United States brought suit against the railroad company and the lumber company for trespass, and that the claim of the government was settled by the payment by the railroad company of $244.96. Under the contract, this was a proper set-off against the demand of the lumber company. But it is expressly alleged by the

defendant and stipulated that, in paying to the Exchange National Bank the amount due on account of the January delivery, the $244.96 was deducted from the $3,302.52. Defendant's claim upon this account has, therefore, been fully satisfied, and cannot be again used as a set-off.

It is further stipulated that the demand of the United States for trespass amounted to $4,929.24, and that, in defending against it, the railroad company necessarily expended the sum of $124.54. It is not clear why this item was not, like the $244.96, deducted from the $3,-302.52, if the railroad company considered it a proper and just set-off; but under the stipulated facts, no good reason is perceived why the charge is not covered by the lumber company's obligation of indemnity, or why the railroad company is not now entitled to be reimbursed therefor. The amount was paid out as costs and expenses in legal proceedings against the railroad company to recover the value of those ties which had been wrongfully cut upon public lands.

The third item of the counterclaim is $126, representing expenses incurred by the railroad company in sending a train to the place where the ties were delivered upon its right of way. As we have already seen, complete and absolute delivery of the ties was made by the lumber company to the railroad company in January. The lumber company was not thereafter in any wise responsible for the ties, and exercised no control over them. Notwithstanding such delivery, a creditor of the lumber company brought suit in attachment against it, and the sheriff of Shoshone county, in executing the writ, seized the ties as its property. The railroad company, acting upon information which it claims to have procured from the attorneys for the plaintiff in the attachment suit to the effect that the attachment had been released, sent a train to the place where the ties were piled, and attempted to load and haul them away, but while it was engaged in so doing the sheriff informed it that the attachment was not released, and warned against removal of the ties. The $126 item represents the expense of this trip. Upon what theory of law can the item be considered a just charge against the lumber company? There is no pretension that it, or any of its officers, or agents, or attorneys misled or deceived the railroad company, or, directly or indirectly, caused it to make the fruitless trip. Moreover, the lumber company had no responsibility in the premises. When it delivered to the railroad company ties in accordance with the specifications of the contract, and they were accepted by the railroad company, if at the time of their delivery and acceptance the lumber company's title thereto was good and the ties were free from all encumbrances and liens, its guaranty was fulfilled. It did not instigate the seizure of the ties, and was in no wise responsible therefor. The attaching creditor had no more right in law to make the seizure than he did to attach one of the defendant's engines or cars. If the sheriff of Shoshone county violated the defendant's rights by attaching its property in a suit against a third person, the defendant had its remedy against the sheriff.

The fourth, and last, item of the counterclaim is $172.29, representing the increased cost of ties purchased by the railroad company. The

contract provided that, in case the second party should fail to deliver to the railroad company any portion of the ties contracted for within the time therein provided, the railroad company should have the right to purchase from other parties a sufficient number to make up the deficiency, and should be entitled to charge the lumber company the cost of such ties in excess of the prices which the lumber company was to receive under the contract. It is stipulated that the lumber company delivered 31,331 ties, all before the 1st of February, 1900; that of said 31,331 so delivered the railroad company was deprived of some of the ties seized by the sheriff in said attachment suit from about the middle of February, 1900, to the middle of October, of the same year. It is further stipulated "that by reason of the failure of the said Clearwater Land, Log & Lumber Company to furnish said Clearwater Short Line Railway Company with ties in excess of 31,331 ties, and by reason of the inability of said railway company to secure possession of said 11,305 of the said 31,331 ties from the time of said attachment until between the first and the middle of October, 1900, it became necessary for said railway company to secure ties otherwise and elsewhere to be used in the construction of its line of railway as aforesaid, and said railway company did secure ties otherwise and elsewhere, and used the same in said construction; that the amount so secured otherwise and elsewhere was 11,188, and the same were secured in the month of March, 1900; that the said 11,188 ties so secured otherwise and elsewhere by said railway company cost said company $172.89 more than the contract price of said 11,188 would have been under said contract with the said Clearwater Land, Log & Lumber Company." It will be noted that under the stipulation of facts, and upon the record, it is impossible to determine what part of the $172.89 is claimed to have been the result of the attachment, and what part the result of the failure of the lumber company to deliver the full number of 300,000 ties. What has already been said relative to the item of $126 is applicable to so much of the item as represents damages flowing from the wrongful attachment; the lumber company is not chargeable therewith. If, in being deprived of the possession and use of the ties by the wrongful attachment, the railroad company suffered damages, it should have proceeded against the sheriff. The facts stipulated are not sufficient to enable the court to make a finding as to what damage, if any, the railroad company suffered by reason of the default of the lumber company to furnish the full number of 300,000 ties. Four months before the time for completing the contract had elapsed, the railroad company purchased ties at a price in excess of the contract price; no authority for so doing was conferred by the contract, and, upon the showing, no credit can be allowed to defendant on account of this item.

It is concluded that there should be credited upon the $378 due from the defendant to the lumber company the $124.54 expended by the railroad company in defending the trespass suits, and that the plaintiff should have judgment for the balance of $253.46, and interest thereon at the rate of 7 per cent. per annum from January 1, 1900, to the date of the entry of judgment.