[No. 13105.  *En Banc.*  December 6, 1916.]

JAMES DUNLAP, *Trustee, Appellant,* v. SEATTLE NATIONAL BANK, *Respondent.*[1]

JURY—RIGHT TO JURY TRIAL—LEGAL OR EQUITABLE ACTION. An action by a trustee in bankruptcy to recover moneys deposited by the insolvent bank in another bank pursuant to a fraudulent conspiracy, is of an equitable nature, and there is no right to a jury trial, where an accounting of continuous transactions was necessary.

SAME. Where two causes of action are stated, one legal and the other equitable, equity takes jurisdiction for all purposes and there is no right to trial by jury.

CONSPIRACY—FRAUD—EVIDENCE—SUFFICIENCY. A fraudulent conspiracy to permit overdrafts in order to enable an insolvent bank to keep open and receive deposits until the co-conspirator was paid or secured cannot be inferred from facts and circumstances lawful in themselves and consistent with an honest purpose; and in such case the evidence is insufficient to show a fraudulent conspiracy where knowledge of the insolvent condition of the bank was not proven and was denied by two witnesses, and there was no proof that the minds of the alleged conspirators were cooperating.

BANKRUPTCY—PREFERENCES—SET-OFF OF BANK DEPOSITS. In the absence of fraud or collusion between a bank and its bankrupt customer, the bank is not required to surrender to the trustee in bankruptcy deposits made by the bankrupt as a condition precedent to proving the balance of its claim, but has a right to appropriate the deposit to the payment of the indebtedness.

SAME. To constitute a preferential transfer and voidable preference, within the meaning of the bankruptcy act, there must be a parting with the bankrupt's property for the benefit of the creditor and a diminution of the bankrupt's estate, and the balance of an account current when the transactions cease is to be taken as determining whether there has been an advancement constituting a voidable preference; hence no preference is shown where, at the beginning of the four months' period prior to the filing of the petition, the bankrupt's estate had a credit balance with a bank, and during the period the bank, although it received deposits from time to time, had paid over to the estate a greater sum than it had received.

SAME—PREFERENCES—MORTGAGE TO SECURE ADVANCES—NOTICE OF INSOLVENCY. A note and mortgage given to a bank to secure past and future advances, upon which overdrafts were permitted, in the

[1]Reported in 161 Pac. 364.

absence of fraud or collusion, does not constitute a voidable preference within the meaning of the bankruptcy act, where the bank did not have reasonable cause to believe that the taking of the security would effect a preference, nor knowledge of facts which, if pursued, would have shown insolvency; mere suspicion is not sufficient, the burden being upon the trustee to show reasonable grounds of belief.

TRIAL—FINDINGS OF FACT—NECESSITY. Findings of fact are not essential in an equitable case.

APPEAL—OBJECTIONS—WAIVER. Reversible error cannot be predicated upon reopening a case for further testimony, where no objection was made below.

TRIAL—CONDUCT—REOPENING—DISCRETION. It is discretionary to reopen a case, during the progress of the argument, for the taking of further testimony.

BANKRUPTCY—PREFERENCES—KNOWLEDGE OF INSOLVENCY. Where a bankrupt bank closed on May 16, and on the previous day at about 4 o'clock in the afternoon, an officer of a creditor bank had notice of the insolvency, remittances received by the creditor through the mails on the morning of the 16th, constitute an avoidable preference, in the absence of evidence as to the time they were mailed.

Cross-appeals from a judgment of the superior court for King county, Dykeman, J., entered July 6, 1915, in favor of the defendant, in an action by a trustee in bankruptcy to recover damages for fraud, and for an accounting, tried to the court. Affirmed.

*J. L. Corrigan, E. C. Million,* and *Thomas Smith,* for appellant.

*Oldham & Goodale,* for respondent.

MAIN, J.—This action was instituted by the trustee in bankruptcy of the estate of W. E. Schricker and L. L. Andrews, copartners doing business as W. E. Schricker & Company, and W. E. Schricker and L. L. Andrews, individually. In the amended complaint, two causes of action are stated.

In the first, it is charged that W. E. Schricker and the officers of the defendant, the Seattle National Bank, entered into a fraudulent scheme and conspiracy whereby it was

agreed between the parties thereto that the defendant bank
would advance a sufficient amount of cash to enable Schricker
to keep the Schricker & Company bank open for the recep-
tion of deposits, and that these deposits, when received, should
be transferred to the Seattle National Bank for the purpose
of paying the indebtedness owing to that bank by the
Schricker bank. It is further alleged that, in pursuance of
this scheme or conspiracy, more than $200,000 was received
by Schricker, and in turn transferred to the Seattle National
Bank.

In the second cause of action, it is alleged that, during the
four months preceding the date when the petition in bank-
ruptcy for the Schricker bank was filed, the Seattle National
Bank received deposits from the Schricker bank in excess of
$100,000, and a note and mortgage for the sum of $9,000.
It is claimed that these remittances and the mortgage were
voidable preferences under the Federal bankruptcy act. Upon
the first cause of action, a judgment is prayed for in the
sum of $142,961.85, and upon the second cause of action,
$127,038.15.

After the issues were framed, over the objection of the
plaintiff, the cause was tried to the court without a jury, and
resulted in a judgment denying any recovery upon the first
cause of action, and awarding judgment against the defend-
ant in the sum of $3,485, this being the amount of certain
checks collected by the defendant on the day that the
Schricker bank ceased to do business, and after the Seattle
National Bank had knowledge that it had closed its doors.
From this judgment, both parties appeal.

The record is long, and the briefs are exceedingly large.
The facts are complicated and, in an opinion of reasonable
length, they cannot be stated in great detail. The facts
which will give an understanding of the questions to be deter-
mined may be stated as follows: During the year 1889, W. E.
Schricker and L. L. Andrews formed a copartnership for the
purpose of conducting a private bank at LaConner, Wash-

ington, under the name of W. E. Schricker & Company. Soon after this bank began to do business, the Puget Sound National Bank, located at Seattle, Washington, became its correspondent in that city. The Schricker bank was located in one of the richest agricultural communities of the state. Its customers were largely substantial and well to do farmers and some small merchants. During the year 1898, the Schricker bank became involved with one R. P. Thomas, who, at the time, was operating a sawmill at or near Anacortes, Washington, which will hereafter be referred to as owned by the Fidalgo Mill Company. The relation between the bank and the mill company continued, and the indebtedness from the mill company to the bank increased from time to time. In April, 1909, the mill company was owing the Schricker bank upon notes approximately $159,000, and an equal or greater amount by way of an overdraft. On April 29, 1909, Schricker applied to the Puget Sound National Bank for permission to overdraw his account with that bank, stating that he did not think he would need to exceed $15,000. This permission was granted.

On May 16, 1910, the Puget Sound National Bank and the Seattle National Bank were consolidated under the name of the latter, and the Seattle National Bank became the correspondent of the Schricker bank, as the Puget Sound National Bank had theretofore been. At this time there was an overdraft in favor of the Schricker bank in the sum of approximately $55,000. On November 22, 1910, this overdraft had reached the sum of $102,000, and on this day a letter was written by the vice president of the Seattle National Bank to the Schricker bank, stating that, in advancing funds, that bank preferred that it be arranged in another manner "instead of carrying it as an overdraft." On December 3, 1910, the overdraft having reached the sum of $106,-298.59, five notes were given to cover this amount, four for $20,000 each and one for $26,298.59. No security at this

time was requested or taken to secure the notes, though Schricker had previously offered certain securities.

After these notes were given, Schricker continued his overdrafts with the Seattle National Bank. Much correspondence took place between the parties, the officers of the Seattle bank objecting to the overdraft and urging Schricker to renew certain of his paper and send it to them for rediscount. On May 22, 1911, the indebtedness of the Schricker bank to the Seattle bank upon the notes and upon the overdraft was $143,000. The amount which the Seattle National Bank was permitted to loan to any one customer was $120,000. At this time, the national bank examiner appeared for the purpose of examining the Seattle National Bank. Some time during the month of May, Schricker sent to the Seattle National Bank two notes secured by mortgages for $10,000 each. These notes were transferred to one John Davis, or John Davis & Company, and a deposit made showing the reduction of the Schricker account to the extent of the amount of the notes and mortgages. In addition to this, one of the officers of the Seattle National Bank advanced $3,000 which, taken in connection with the mortgages, reduced the Schricker indebtedness to the legal limit of $120,000. On May 29, 1911, Schricker and his wife came to Seattle, and while there met two of the officers of the Seattle National Bank and executed a deed to an interest in certain coal lands in the state of Pennsylvania, which the Schrickers owned, for the purpose of securing the indebtedness of the Schricker bank to the Seattle National Bank.

The overdraft of the Schricker bank continued until about the middle of June, 1911, when the account shows that that bank had a credit balance with the Seattle National Bank. From this time until the middle of August there were times when the account showed an overdraft, and other times when it showed a credit balance. After the middle of August, 1911, the credit balance increased until, on the 2d day of November, 1911, the Schricker bank had a credit balance with the Seattle

National of approximately $97,000, and was owing upon the notes $106,000. Early in November, Schricker paid the $26,000 note by a check against his credit balance, and at about the same time took back the two notes and mortgages for $10,000 each, and had his account charged with that sum. After November 2, 1911, when Schricker's credit balance had reached its highest point, it gradually declined until February 17, 1912, when again the overdraft appears.

From this time until the 15th day of May the overdraft was continuous. Correspondence took place between the two banks, the Seattle National urging that the overdraft be taken care of, and Schricker, in turn, promising that he would send down notes for rediscount, and thus cover it. On April 15, 1912, the overdraft continuing and the notes not having been sent for rediscount which would cover it, Schricker requested a further overdraft. After this request was received, one of the officers of the Seattle National Bank went to LaConner and saw Schricker in the latter's bank. This officer of the Seattle National had $1,000 in currency with him for the purpose of delivering the same to Schricker when the latter should turn over the notes for rediscount. The meeting occurred in the Schricker bank. The officer of the Seattle National requested that he be permitted to see Schricker's note case, and the latter thereupon got it and placed it upon the table with the remark that the matter was all over, or something to that effect. The officer of the Seattle National opened the note case and learned for the first time that the $159,000 of one-name paper held by the Schricker bank was Fidalgo Mill Company notes, some of which had then been outlawed. The Seattle National Bank declined to make any further advances, and on the day following, Schricker's bank closed.

All loans and advances by the Schricker bank to the Fidalgo Mill Company were made prior to the time when the Seattle National Bank became the correspondent of that bank. The money advanced by the Seattle National was used

by the Schricker bank to meet the demands of its depositors. The petition in bankruptcy was filed on May 22, 1912.

This is but a skeleton of the facts as they appear in the record. Further reference will be made to the facts in connection with the points to which they may be particularly pertinent.

The first question is whether the plaintiff was entitled to a jury trial. The second cause of action may be conceded to be legal in its nature. The first cause of action, if the plaintiff should prevail, would necessarily involve an accounting. If a conspiracy existed Schricker was a party thereto, and nothing could be recovered on his account. The amount of the recovery arising from the fraudulent scheme or conspiracy as alleged would be the costs and expenses of the litigation and what the depositors of the Schricker bank had lost by reason of such fraudulent scheme or conspiracy. The transactions between the two banks were continuous and almost daily, and were of the same general character as exists between two correspondent banks. The amount of the deposits made by the Schricker bank in the Seattle National would not be the correct measure of recovery. For instance, if a customer with the Schricker bank should deposit $10,000 therein on one day in the form of a check drawn upon some other bank, and Schricker should send this check to the Seattle National Bank for collection and deposit in that bank, and a few days later the customer of the Schricker bank should draw out his $10,000 from the Schricker bank, and Schricker should in turn withdraw the same amount from the Seattle bank, obviously this deposit should not be included in the amount of recovery.

To determine the amount of recovery, if any were to be had, an accounting would be necessary, and consequently it is a subject of which equity takes jurisdiction. 1 Pomeroy, Equity Jurisprudence (3d ed.), § 140. It is a familiar rule that "when a court of equity has jurisdiction over a cause for any purpose, it may retain the cause for all purposes, and

proceed to a final determination of all the matters at issue."
1 Pomeroy, Equity Jurisprudence (3d ed.), § 181.

It follows, therefore, that where two causes of action are
stated in the complaint, one of which is legal and the other
equitable, equity takes jurisdiction for all purposes and pro-
ceeds to a final determination of all matters at issue. *Cogs-
well v. New York, N. H. & H. R. Co.*, 105 N. Y. 319, 11 N. E.
518; *McKinley v. Britton*, 55 Ind. App. 21, 103 N. E. 349.
There are other reasons urged why plaintiff was not en-
titled to a jury trial in this case, which it is not necessary
here to review. The trial court did not err in denying a jury
trial.

Upon the merits, the first question is whether the officers
of the Seattle National Bank and Schricker entered into a
fraudulent scheme or conspiracy as alleged in the first cause
of action. If the officers of the Seattle bank did not know
that the $159,000 of one-name paper in the Schricker bank
was that of the Fidalgo Mill Company, and did not know
that the overdraft to that mill company was far in excess of
its value, there is nothing upon which to base the charge that
appears in the complaint. Schricker did not testify upon the
trial. Two officers of the Seattle National Bank had died
subsequent to the failure of the Schricker bank, and prior to
the trial of this action. The two officers of the Seattle bank
who testified both denied positively that they, at any time,
knew or suspected that the Schricker bank was insolvent
until the afternoon of April 15, 1912, when Schricker's note
case was examined for the first time. They testified that they
did not know the $159,000 in notes was Fidalgo Mill paper,
but believed it was largely the notes of well to do farmers and
a few small merchants. They also testified that, while they
knew from and after the 29th day of May, 1911, there was
an overdraft to the Fidalgo Mill Company in the sum of
$189,000, they had been assured by Schricker that this over-
draft was secured upon the mill, and that the mill property
was worth $250,000. The truthfulness of the testimony of

these two witnesses is vigorously assailed by the plaintiff, but apparently it was not disbelieved by the trial court, and the record furnishes no reason to regard their testimony other than truthful.

The plaintiff, in support of his charge, does not rely upon positive testimony, but upon circumstances, claiming that these establish the charge as made. Fraud cannot be inferred from facts and circumstances lawful in themselves and consistent with an honest purpose. If, when all the facts and circumstances are taken together, they are consistent with an honest intent, proof of fraud is wanting.

In *Foster v. McAlester*, 114 Fed. 145, the circuit court for the eighth circuit, said:

"Fraud cannot be inferred either by the court or jury from acts legal in themselves, and consistent with an honest purpose. The settled rule on this subject is that slight circumstances, or circumstances of an equivocal tendency, or circumstances of mere suspicion, leading to no certain results, are not sufficient to establish fraud. They must not be, when taken together and aggregated—when interlinked and put in proper relation to each other,—consistent with an honest intent. If they are, the proof of fraud is wanting."

It is true that the officers of the Seattle National Bank knew, for some time prior to May 15, 1912, that, unless they advanced money to the Schricker bank from time to time, it would be necessary for that bank to close; and it is also true, as stated in one of the letters, that the condition of the Schricker bank had been a matter of concern to the Seattle bank. If the Schricker bank's $159,000 of notes was good paper, as was represented by Schricker, and the overdraft to the Fidalgo Mill Company was secured by a mortgage on property worth $250,000, the bank would not be insolvent, even though it did not have cash sufficient for its daily needs. If the assets were sufficient to meet the obligations within a reasonable time, the bank was not insolvent. *State v. Cadwell*, 79 Iowa 432, 44 N. W. 700. Over the correctness of this

rule as to insolvency, there seems to be no controversy in the briefs, and further discussion of it is unnecessary.

In order that there be a conspiracy, it would be necessary that the record show that the minds of Schricker and the officers of the Seattle National Bank cooperated. A careful reading of the entire record in this case leads to the conclusion that the minds of these men were not cooperating, but that Schricker was deceiving the Seattle National Bank as to the real condition of his bank. There are two circumstances which indicate very strongly that the officers of the Seattle National Bank did not know of the insolvency of the Schricker bank prior to the afternoon of April 15, 1912. One of these is the disposition of the two notes and mortgages for $10,000 each which Schricker had sent down in May, 1911, and taken back in November of the same year. When these mortgages were paid by the charges upon his account at his request for the amount thereof, the Seattle National Bank inquired of him what disposition he desired made of the mortgages, and was directed to return them to him. At this time, Schricker still owed the Seattle National Bank upon the notes which were secured alone by a deed to the interest in the Pennsylvania coal lands, which was represented by Schricker, at the time the deed was given, to be worth from $75,000 to $100,-000. Had the officers of the Seattle National Bank at this time believed that Schricker's bank was insolvent, certainly they would have retained these mortgages as additional security.

The other circumstance is that when Schricker's deposits had reached the sum of $97,000, he was then owing his five notes aggregating the sum of $106,000. Had the officers of the Seattle National Bank then believed him to be insolvent and refused to extend him further credit, they would have had the legal right, in the absence of fraud or collusion, to have had this $97,000 applied upon the notes. This proposition is strongly controverted by the plaintiff, but in the light

of the holdings of the Federal supreme court, which will be here referred to, the question is not a debatable one.

In *New York County Bank v. Massey*, 192 U. S. 138, it was held that, even though the bank knew at the time certain deposits were made by its customer that his liabilities greatly exceeded his assets, the bank, under the Federal bankruptcy act, was not required to surrender to the trustee in bankruptcy the deposits as a condition precedent to proving the balance of its claim, but it had the right to appropriate the deposit to the payment of the indebtedness of the customer of the bank. It was there said:

"As we have seen, a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage, gift or security. It is true that it creates a debt, which, if the creditor may set it off under section 68, amounts to permitting a creditor of that class to obtain more from the bankrupt's estate than creditors who are not in the same situation, and do not hold any debts of the bankrupt subject to set-off. But this does not, in our opinion, operate to enlarge the scope of the statute defining preferences so as to prevent set-off in cases coming within the terms of section 68a. If this argument were to prevail, it would in cases of insolvency defeat the right of set-off recognized and enforced in the law, as every creditor of the bankrupt holding a claim against the estate subject to reduction to the full amount of a debt due the bankrupt receives a preference in the fact that to the extent of the set-off he is paid in full."

Further in the same opinion, it is stated:

"It is true, as we have seen, that in a sense the bank is permitted to obtain a greater percentage of its claim against the bankrupt than other creditors of the same class, but this indirect result is not brought about by the transfer of property within the meaning of the law. There is nothing in the findings to show fraud or collusion between the bankrupt and

the bank with a view to create a preferential transfer of the bankrupt's property to the bank, and in the absence of such showing we cannot regard the deposit as having other effect than to create a debt to the bankrupt and not a diminution of his estate."

In *Studley v. Boyleston Nat. Bank*, 229 U. S. 523, under facts similar to those in the *Massey* case, and following that case, it was held that the bank itself had the right to make the appropriation and prove its claim for the balance. It was there stated:

"If this set-off of mutual debts has been lawfully made by the parties before the petition is filed, there is no necessity of the trustee doing so. If it has not been done by the parties, then, under command of the statute, it must be done by the trustee. But there is nothing in § 68a which prevents the parties from voluntarily doing, before the petition is filed, what the law itself requires to be done after proceedings in bankruptcy are instituted."

In *Germania Sav. Bank & Trust Co. v. Loeb*, 188 Fed. 285-288, the circuit court of appeals for the sixth circuit stated the doctrine of the *Massey* case as follows:

"It has been authoritatively decided by the Supreme. Court, in considering these two sections, that the balance of a regular bank account at the time of filing the petition is a debt due to the bankrupt from the bank, and in the absence of fraud or collusion between the bank and the bankrupt, with the view of creating a preferential transfer, the bank need not surrender such balance, but may set it off against the notes of the bankrupt held by it, and may prove its claim for the amount remaining due on the notes."

The trial court properly denied a recovery upon the first cause of action.

Upon the second cause of action, recovery is sought for the amount of deposits which were made in the Seattle bank by the Schricker bank within the four months previous to the filing of the petition in bankruptcy, and also for the note and mortgage in the sum of $9,000 which was sent by the Schricker bank to the Seattle National Bank some time during

the month of February, 1912. Considering first the claim for the money which it alleged the Seattle National Bank received, it appears that, during this period of time, the account between the two banks was a mutual running account. Where the account between the bankrupt's estate and the person or corporation charged with having received a preference is an account current, the balance of· the account, when the transactions cease, is to be taken in determining whether there has been an advancement by the bankrupt's estate which would constitute a voidable preference. If the bankrupt's estate has not been diminished by reason of the transactions, there is no voidable preference. *Morey Mercantile Co. v. Schiffer*, 114 Fed. 447; *In re Dickson*, 111 Fed. 726, 55 L. R. A. 349; *Jaquith v. Alden*, 189 U. S. 78.

In the last case cited, speaking upon this question, it was said:

"The account was a running account, and the effect of the payments was to keep it alive by the extension of new credits, with the net result of a gain to the estate of $546.89, and a loss to the seller of that amount less such dividends as the estate might pay."

To constitute a preferential transfer within the meaning of the bankruptcy act there must be, first, a parting with the bankrupt's property for the benefit of the creditor, and second, diminution of the bankrupt's estate. In *Continental & Commercial Trust Co. v. Chicago Title & Trust Co.*, 229 U. S. 435, it was said:

"This case must be dealt with in the light of certain principles, established by decisions of this court, in determining the applicable provisions of the bankruptcy act. To constitute a preferential transfer within the meaning of the bankruptcy act there must be a parting with the bankrupt's property for the benefit of the creditor and a consequent diminution of the bankrupt's estate."

Applying the doctrine of these cases to the facts in the present case, it appears that, at the beginning of the four months' period, the bankrupt's estate had a credit balance

with the Seattle National Bank, and at the time the bank was closed it had an overdraft. During this period of time, the Seattle National Bank, while it had received deposits from the bankrupt's estate from time to time, had paid over to the estate or for the estate's benefit a greater sum of money than it had received. Taking the balance of the account, there was nothing upon which to predicate an action for voidable preferences.

As to the $9,000 note secured by a mortgage, it must be dealt with in two aspects. The evidence shows that the mortgage was given to secure both antecedent indebtedness and subsequent advancements. Considering first the question relative to the subsequent advancements, the rule of the Federal courts is that a security transferred for future advances, in the absence of fraud or collusion, does not constitute a voidable preference. *Tomlinson v. Bank of Lexington*, 145 Fed. 824; *Van Iderstine v. National Discount Co.*, 227 U. S. 575. The doctrine of these two cases may be stated by quoting a paragraph from the syllabus of the *Tomlinson* case as follows:

"Where a bank allowed a customer to overdraw on the express agreement that the customer should assign good accounts for collection to pay the overdraft the subsequent assignment of the accounts, although the customer was insolvent, did not constitute the giving of a preference."

The note and mortgage being for $9,000, and the overdraft at the conclusion of the account being for a less sum, or $7,161.11, the question arises whether the difference between the amount of the note and the amount of the overdraft would constitute a voidable preference when applied as security for the antecedent debt. The bankruptcy act does not prohibit the taking of such security, but makes it a voidable preference if the creditor, at the time it is received, has reasonable cause to believe that the transfer of the security "would effect a preference." Federal bankruptcy act, par. 60. The burden is on the trustee to show that the creditor

had reasonable ground to believe that the transfer of the security would effect a preference. *United States v. Reardon & Sons*, 191 Fed. 454; *In re Hull*, 224 Fed. 796.

Mere suspicion is not sufficient to charge the creditor with knowledge or reasonable cause to believe that the transfer of the security will effect a preference, but there must be evidence of facts sufficient to put a reasonably prudent person upon inquiry which, if pursued, would show insolvency, and that a preference would be the result of the taking of the security or the receiving of payments. In *Nichols v. Elken*, 225 Fed. 689, the circuit court of appeals for the eighth circuit used this language:

"Mere suspicion, of course, is not sufficient to charge the defendants with knowledge of, or reasonable cause to believe, Tilden's insolvency at the time of these payments; but there must be evidence of facts sufficient to put a reasonably prudent person upon inquiry, which, if pursued, would show that Tilden was insolvent and that a preference would be the result of making these payments."

The remarks of the Federal supreme court in *Grant v. National Bank*, 97 U. S. 80, are pertinent here. It was said:

"It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it,—and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. Receiving payment is put in the same category, in the section referred to, as receiving security. Hundreds of men constantly continue to make payments up to the very

eve of their failure, which it would be very unjust and disastrous to set aside. And yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose.

"The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice. It would, in fact, have the effect of producing bankruptcy in many cases where it might otherwise be avoided.

"Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man.  ₒ

"It is on this distinction that the present case turns. It cannot be denied that the officers of the bank had become distrustful of Miller's ability to bring his affairs to a successful termination; and yet it is equally apparent, independent of their sworn statements on the subject, that they supposed there was a possibility of his doing so. After obtaining the security in question, they still allowed him to check upon them for considerable amounts in advance of his deposits. They were alarmed; but they were not without hope. They felt it necessary to exact security for what he owed them; but they still granted him temporary accommodations. Had they actually supposed him to be insolvent, would they have done this?"

The evidence in the present case does not show that the officers of the Seattle National Bank had reasonable cause to believe that the taking of the security would effect a preference. Neither does the evidence show that they had knowl-

edge of facts which, if pursued, would have shown the insolvency at the time.

Another contention is that the judgment should be reversed because no findings of fact and conclusions of law were entered by the trial court. This contention, apparently, is based on the assumption that the action was legal and not equitable. As we have already seen, the cause was one of which a court of equity had jurisdiction. No findings, therefore, were necessary.

The final contention on the part of the plaintiff is that the trial court erred, after the evidence had closed and during the progress of the argument, in directing that one of the witnesses take the witness stand and testify upon matters relative to which he had not been interrogated by either side when previously testifying. During the argument, the court inquired of counsel for the defendant why he had not interrogated this witness relative to certain matters, specifying them. Thereupon a colloquy took place between the court and counsel for defendant, which resulted in the witness being called to the stand and his testimony taken. There are two reasons why this was not reversible error. First, the record does not show the interposition of any objection to the testimony, and second, it was not an abuse of discretion reposed in the trial court.

Upon the appeal of the defendant, little need be said. On May 16, 1912, the day the Schricker bank closed, the Seattle National Bank received certain remittances through the mail. On the previous day, at approximately four o'clock in the afternoon, the officer of the Seattle National Bank who had gone to LaConner ascertained that the Schricker bank was insolvent. These remittances were received after knowledge of insolvency, and with knowledge that they would effect a preference. For a reversal of this portion of the judgment, the defendant relies upon the case of *McDonald v. Chemical Nat. Bank,* 174 U. S. 610. In that case, the remittances were made several days before suspension by a bank in Ne-

braska to the Chemical National Bank in New York, and were received after suspension. But the evidence in this case does not bring it within the rule of that case. There is here no evidence as to when the remittances were mailed. The only evidence is that they were received on the morning of the 16th. So far as the record shows, they may have been mailed subsequent to the time when the Seattle National Bank had actual notice of the insolvency.

The judgment will be affirmed.

MORRIS, C. J., MOUNT, HOLCOMB, PARKER, FULLERTON, ELLIS, and CHADWICK, JJ., concur.