LESLIE F. MCBRIDE, individually and as next friend of JOHN McBRIDE, appellant, v. GEORGE E. DEXTER, SR., individually and as administrator of estate of GEORGE E. DEXTER, JR., appellee.

No. 49501.

(Reported in 92 N.W.2d 443)

8

October 14, 1958.

Waldo M. Wissler, of Davenport, for appellant.

McDonald & McCracken and Walter E. Kroeger, all of Davenport, for appellee.

Thompson, J.—This case presents an appeal from a verdict for the defendant returned by direction of the court at the close of plaintiff's evidence. The issues revolve largely around Code section 321.494, Code of 1958, commonly known as the Iowa Guest Statute. Because of its importance in the case we set it out herewith:

"321.494. Guest statute. The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire unless damage is caused as a result of the driver

of said motor vehicle being under the influence of intoxicating liquor or because of the reckless operation by him of such motor vehicle."

On the evening of November 26, 1955, George E. Dexter, Jr., was driving a Mercury automobile, in good condition, with the consent of his father, the defendant, George E. Dexter, Sr. A few days before the date named the rear fender skirts had been stolen from the car while it was parked in the town of Walcott, Iowa. Walcott is in Scott County a few miles from Bettendorf, in the same county. John McBride, who brings the action through his father as next friend, was 17 years of age at the time. He will be hereinafter referred to as the plaintiff. All of the boys involved in the accident were students at the Bettendorf High School.

On the evening in question the plaintiff and James Ritter, also 17 years old, were at a skating rink in Bettendorf when George E. Dexter, Jr., drove up with his father's car. With him was Roger Iossi, age 15. During the week Dexter had told Ritter of the theft of fender skirts and asked Ritter to go with him to Walcott to look for them, and Ritter had agreed, but no time was fixed. At the skating rink Dexter again asked Ritter if he wished to go to look for the skirts, and Ritter again consented. Dexter, Ritter, Iossi, the plaintiff McBride, and two other boys, Jack Kreiter and one Kapinski, then entered the automobile and proceeded to Walcott. Kapinski did not start the return trip, on which the accident occurred, with them, and was not called as a witness in the case.

Count I of plaintiff's petition alleges that McBride accompanied Dexter for the purpose of assisting him in looking for and endeavoring to recover the skirts. This, it is urged, made him a passenger for the definite, tangible benefit of the operator, and so removed his status from that of a guest or passenger not for hire within the meaning of section 321.494, supra. See Knutson v. Lurie, 217 Iowa 192, 251 N.W. 147, a leading case on this point; Thuente v. Hart Motors, 234 Iowa 1294, 15 N.W.2d 622; and Stenberg v. Buckley, 245 Iowa 622, 61 N.W.2d 452. These, and other cases cited by the plaintiff, deal with the question of when a passenger is not a guest, but is being transported either for the joint and mutual benefit of the driver and rider

or for the benefit of the driver alone. If plaintiff's position at this point were sound, he would be freed of the necessity of proving recklessness on the part of the driver of the car; proof of negligence would entitle him to the consideration of the jury.

But the weakness of his case at this point is that there is no evidence that the plaintiff went on the trip for the purpose of aiding Dexter in searching for his fender skirts. No one so testifies. The plaintiff himself remembered the arrival of Dexter and Iossi and the automobile at Bettendorf; he talked with them but did not remember the subject of the conversation. He remembered being in Walcott, and that the car ran off the highway on the trip home.

Roger Iossi said that he started out with Dexter that evening with the intent that they would go to Walcott to look for the skirts. They talked with Ritter and the plaintiff, and Dexter said he was going to Walcott to search for the skirts. Ritter and McBride asked to go along. When they got to Walcott they drove around the block twice looking for the skirts, then entered a café, ate and drank some soft drinks, and started back for Davenport. There is no evidence that McBride would have recognized the skirts if he had seen them. Jack Kreiter, another high school student who made the trip, did not remember any special purpose of the trip, and thought they were just going for a ride. Ritter's testimony is that Dexter asked him to help look for the skirts; he does not say McBride was requested, or agreed, to help.

This is the total of the evidence bearing on the question, and it fails to show anything for the jury's determination upon the claim that McBride was on the trip for the benefit of Dexter. We are mindful of the rule that in considering the correctness of a ruling which directs a peremptory verdict for the defendant the evidence must be taken in the aspect most favorable to plaintiff which it will reasonably bear. But there is nothing from which it could reasonably be deduced that any definite and tangible benefit to Dexter was bargained for or expected from McBride's presence in the car.

In fact, the plaintiff says in his brief and argument that "plaintiff's main reliance is upon the point of recklessness shown by the evidence; * * *." While this is not an entire abandonment

of the issue of benefit to the driver of the car pleaded in Count I, it does show some lack of confidence in the position there taken, which doubt we share in a more positive form.

One further question concerning the evidence of benefit to the driver of the car involves a somewhat unique contention by the plaintiff as to the duty of the trial court to call witnesses as its own so that they may be cross-examined and possibly impeached. We shall discuss this in Division II following.

II. Error is assigned upon the denial of a request by the plaintiff that the court call Roger Iossi and Jack Kreiter as its own witnesses. This request was made before they were called by the plaintiff, and it is the contention of the plaintiff that if the court had done so the plaintiff would not have been compelled to vouch for their testimony as he did by calling them himself; and further, that if the court had called them he could have then cross-examined them and so possibly have elicited evidence that he, the plaintiff, accompanied Dexter on the trip for the purpose of aiding in the search for the stolen fender skirts. The court refused to call these witnesses as its own, and the plaintiff thinks prejudicial error resulted. The plaintiff then called them; but under his examination nothing was shown tending to prove that McBride made the trip to help in the search; in other words, that he made the trip for a definite and tangible benefit to the driver of the automobile.

The contention is a novel one in that the claim is made not only that the court had the right in the exercise of its fair discretion to call witnesses as its own, but that it was error not to do so when requested by one of the parties. No authority is cited which so holds, nor have we discovered any. There are many cases in which it has been held not to be error for the court to ask questions of witnesses called by one of the parties, and many others holding that it is not an abuse of discretion for the court, upon its own motion or that of a party, to call witnesses neither of the litigants saw fit to offer. Many of these cases involve situations in which the prosecution asked the court to call witnesses who were thought to have knowledge of the facts but who were thought by the state to be hostile or of doubtful reliability or veracity; and in which the court acceded to the

request. In this category are Litsinger v. United States, 7 Cir., 44 F.2d 45, 47; People v. Rotello, 339 Ill. 448, 171 N.E. 540, 541, 542, and United States v. Lutwak, 7 Cir., 195 F.2d 748, 754. There are also some civil cases which announce the doctrine that the trial court has a considerable discretion in calling witnesses. Merchants Bank v. Goodfellow, 44 Utah 349, 140 P. 759; Dunlap v. Seattle National Bank, 93 Wash. 568, 161 P. 364. In Chalmette Petroleum Corp. v. Chalmette Oil Distributing Co., 5 Cir., 143 F.2d 826, 829, cited by the plaintiff, the appellate court, in discussing the power and duty of the court to call witnesses who might be thought to be able to throw some light on the questions being litigated, said: "We have sanctioned this in a criminal trial, and see no reason why it may not be done in a case like this if the judge, *in his discretion,* thinks it wise and proper." (Italics supplied.) Wigmore on Evidence, Third Ed., Volume IX, section 2484, says of the court's power to call witnesses: "That he has no burden or duty of doing so is plain in the law."

The unanimous current of authority is that the court may exercise its discretion in calling or refusing to call witnesses upon request of one of the parties. We find no abuse of such discretion here.

III. The question of recklessness under the guest statute posed by Count II of the petition requires an additional statement of facts. The accident which caused the death of Dexter, the driver of the car, and the serious injuries to the other boys, including plaintiff, occurred as they were returning from Walcott. They had driven from Walcott to U. S. Highway 6, turned upon it and had proceeded some miles when they approached an eight-degree left curve in the roadway. There is no direct evidence of the speed at which they were traveling at this point. Roger Iossi, age 15, with no real experience in driving automobiles, thought they were traveling at 80 miles per hour at a point some five or six miles west of the scene of the accident. About a mile or two prior to reaching the accident scene, however, is a place called Hahn's Corner, where there is an extremely sharp curve with a posted speed limit of 45 miles per hour. Dexter slowed the car to that speed at that point and had no difficulty in negotiating the curve there. He picked up speed afterward,

but there is no estimate of how much or at what rate the car was traveling as it approached the place of the accident.

Dexter was familiar with the road. There was a sign showing a curve to the left shortly before the curve itself was reached. The pavement was 24 feet wide, and on the right-hand side there was a shoulder about two feet wide, and beyond it a ditch some three or four feet lower than the roadway. Intersecting this ditch at intervals and raised a few feet above it are driveways leading from the highway to homes built along it. On the night in question the pavement was dry and the weather was clear. There were no posted speed limit signs along the highway or on the curve at or near the accident scene, and no other traffic was involved. The first roadway leading back to a home was about 20 feet from the point where the Dexter car left the pavement.

How or why the automobile left the pavement, which was apparently at a point very near the beginning of the curve, is not shown in the record. It did, however, go first onto the shoulder, then into the ditch, then strike the first raised driveway about 20 feet away, and finally come to rest some 200 feet from the point where it left the pavement. The road sign, indicating the approaching curve, was broken off, leading to the surmise that the car had left the road at that point. Most of these facts are gleaned from the testimony of Roger Crow, a deputy sheriff of Scott County, who was called to the scene of the accident and drew his conclusions from marks on the highway and points along the pathway of the car after it left the road. None of the four survivors testified to any details of the immediate circumstances surrounding the accident. Two of them remembered up to the point where the car started to leave the road; the others only of starting the trip home from Walcott, and no more.

In the absence of any direct evidence of speed as the car reached the place where it left the pavement, the plaintiff urges that we should consider the physical facts, such as that the automobile did in fact go into the ditch, then strike the first raised driveway, and then come to rest some 175 feet farther on, in a badly demolished condition, as shown by photographs in evidence. Also the severe injuries to all the occupants are thought to be further evidence of high speed. Plaintiff relies largely upon

Whiting v. Stephas, 247 Iowa 473, 74 N.W.2d 228, and cases cited therein, including Hart v. Hinkley, 215 Iowa 915, 247 N.W. 258. These authorities discuss the significance of circumstantial evidence as to speed and its bearing upon recklessness as an issue which plaintiff is entitled to have submitted to the jury. Thornbury v. Maley, 242 Iowa 70, 74, 45 N.W.2d 576, and Anderson v. Elliott, 244 Iowa 670, 678, 57 N.W.2d 792, 796, are also cited as controlling authorities, because each involved excessive speed in approaching a curve. There are, however, some important factual distinctions.

In Whiting v. Stephas, supra, the driver of the car involved had stated that he would make the trip from LeMars to Sioux City in twenty minutes, the distance being between twenty and twenty-five miles. Between ten and fifteen minutes after they left LeMars a truck driver appeared there and said an accident had happened at a bridge six miles from LeMars. The curve approaching the bridge which was struck was apparently an abrupt one; at least there was a warning sign "20 M P H." Likewise in Hart v. Hinkley, supra, the roadway necessitated an abrupt turn to the right to reach the bridge and "a more or less abrupt" turn to the left as it left the bridge. We held there was such evidence of speed from the circumstances as to permit an inference of recklessness.

In Anderson v. Elliott, supra, there was substantial direct evidence of excessive speed in approaching a wide curve, in addition to the fact that the curve was not negotiated. In Thornbury v. Maley, supra, there was eyewitness evidence of speed as the driver of the car approached a sharp curve guarded by warning signs. The cases are not close enough on their facts to be of much value here.

It is true the automobile traveled some 200 feet from the point where it left the highway, and was badly damaged; and that the injuries suffered by the occupants were serious; in the case of the driver, fatal. But the evidence shows that about 20 feet after leaving the road the car struck the side of the first raised driveway, a circumstance which would almost certainly throw it out of control. It traveled some 175 feet thereafter, and the deputy sheriff saw no marks it left—from which the plaintiff argues it must have flown through the air from the

driveway to the point where it came to rest. This can hardly be so. In the first instance, the officer said only that "the tracks did not go all the way to the car"—from which he assumed it flew through the air part of the way. He was evidently following tire tracks, and he does not tell us what part of the way the tracks were missing. He found the car sitting on its wheels, with both ends, sides and top badly smashed. This appears from the photographs in evidence. It seems certain that the car must have rolled over, perhaps several times, following the collision with the raised driveway. This would have been the natural result at any considerable speed, even within the limits of normal nighttime driving care. Once the car had gone off the highway and struck the driveway, serious results were almost sure to follow.

Another item which differentiates this case from Whiting v. Stephas, Anderson v. Elliott, Thornbury v. Maley, all supra, and others relied upon by the plaintiff, is the nature of the curve. It was an eight-degree curve, and as shown in a photograph in the record is a very slight one. It would not normally be a serious danger even if entered at a considerable speed. The change in direction is very little, and on a 24-foot highway with no other traffic at hand could be negotiated with the slightest change in the steering of the car. The care required in approaching a curve such as this is in no way comparable to that needed where the curve is sharp or makes a considerable change in the direction of the road being traveled.

We have said: "It is the general rule of this state that in matters of proof, a litigant is not justified in inferring a fact as proven from mere possibility of existence of facts." Phillips v. Briggs, 215 Iowa 461, 465, 245 N.W. 720, 722. In Siesseger v. Puth, 213 Iowa 164, 182, 239 N.W. 46, 54, one of the most frequently cited cases in our reports, we defined recklessness as implying "no care, coupled with disregard for consequences." In the absence of a more adequate showing than has been made here, we cannot find any evidence for the jury's consideration upon the question. All that we have is a car leaving the highway and causing serious damage. There is no record of any statements by the driver showing disregard for consequences, or of any protests by the passengers about the manner

of driving. Speed is shown only by the damages sustained by the automobile and its occupants; and in view of the nature of the curve it is apparent a competent driver might have traversed it at a comparatively high rate. The driver had been exercising care at the sharp corner a mile or two back of the place of the accident; and while this is not controlling, the evidence shows that he had reduced speed there, and we are left without any real guide as to how much he accelerated and at what speed, whether 50 or 60 or 80 miles per hour he approached the place where his car left the highway. We see nothing more than a mere possibility of the existence of facts from which an inference of recklessness might be drawn.

The trial court was not in error in directing a verdict for the defendant.—Affirmed.

All JUSTICES concur.